Filed 9/19/25; Modified and Certified for Pub. 10/9/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br><br>RAUL GARCIA,<br><br>      Defendant and Appellant. | A165535<br><br>(Alameda County<br>Super. Ct. No. 18CR003071) |

Garcia was convicted of three sexual offenses against his eldest daughter with his long-term romantic partner, Y.C. (Mother), and six sexual offenses against Mother's youngest daughter from a previous relationship.  In this appeal, he claims a host of trial errors requires us to reverse his convictions.  We affirm the judgment.

## I.  BACKGROUND

### A.  Garcia and Mother's Family and Living Arrangements

In 2006, Garcia was living with Mother's cousin in Union City when he met Mother.  Mother had two young daughters, K. (Stepdaughter K., born in 2001) and M. (Doe 2, born in 2002).  Garcia and Mother dated for about six months, then she and her daughters moved in with Garcia and her cousin for

1

about six months, sharing a two-bedroom home with Mother's cousin, his wife, and their children.

After briefly renting a room from a couple in Hayward, Garcia, Mother, and her daughters moved in with Garcia's sister (Sister). They lived in two different homes in Oakland with Sister and her four children. Garcia and Mother's first daughter (Doe 1) was born during this time, in 2007. Soon after, Garcia, Mother, and the three girls moved out of Sister's home and briefly lived in Fruitvale. In 2008 or 2009, they moved to a two-room apartment in the South Garden area of Hayward, where they sometimes babysat Sister's children.

In 2009, Sister reported Mother to Child Protective Services for physically disciplining Stepdaughter K. and Doe 2. (Mother denied doing so herself, but acknowledged Garcia "would put [the girls] in the bathroom and use the belt on them.") Mother believed Sister accused her because she said she could not take care of Sister's children, who ultimately were all removed from Sister's custody. Around this time, Garcia, Mother, and her daughters lost contact with Sister and her children.

Garcia, Mother, and the girls then spent a year living with Mother's aunt in Castro Valley before renting their own one-bedroom home in San Leandro for two years. Garcia and Mother's second daughter was born when they lived in San Leandro, in 2012. Garcia, Mother, and the four girls next stayed at two different homes in Hayward with members of Mother's church, then moved back in with Mother's aunt in Castro Valley. Finally, they moved to their own one-bedroom home in Hayward (Hayward Residence), where they lived from around 2014 until 2018.

In 2015, the girls were briefly removed from Mother's custody after Stepdaughter K. reported to a school counselor that Garcia had touched her

inappropriately. Doe 1, Doe 2, and Stepdaughter K. were interviewed at a Child Abuse, Listening, Interviewing, and Coordination Center (CALICO). Stepdaughter K. then recanted her allegations. She returned to live with Mother and Garcia, but ran away from home multiple times.

## B. Garcia Is Charged with Abusing Doe 1 and Doe 2

In February 2018, Garcia and Mother were planning to get married. Stepdaughter K. had run away and was not living with them.

One evening, Garcia, Mother, and the other three girls were together in the living room, where there was a single small bed. Mother was on the bed and Garcia was lying down with Doe 1, then 11, and Doe 2, then 15, under a blanket on the floor. Mother "sensed something that [she] had never felt before, and [she] saw movements and felt movements." She flashed the light on her phone towards Garcia and the girls, and Doe 1 looked at her. Mother could tell from Doe 1's face that "something wasn't right there." Garcia lifted his arm off of Doe 1 and told her, " 'Go to[] sleep girl and pray.' "

The next morning, Mother grabbed Doe 1's hands and said, " 'I want you to tell me if something is happening. I am here to take care of you, but I want you to tell me the truth. . . . Do you need to tell me something?' " Doe 1 was wringing her hands and she said, " 'I don't want him to touch me anymore, Mommy. He is touching me, and he is forcing me to touch him. And he also did something to [Doe 2].' " Mother called Doe 2 over and asked her if Garcia was touching her and she wrung her hands, nodded her head, and started crying. Doe 1 looked "fearful" and said she " 'd[id]n't want anything to happen to [Mother]' " because Mother was " 'always in the hospital' " for medical treatments.

That same day, Mother took Doe 1 and Doe 2 to the Hayward Police Department, where an officer briefly interviewed Doe 1. Doe 1 told the officer

3

that Garcia had been touching her "private parts" and had also touched Doe 2. Doe 1 and Doe 2 were then interviewed by CALICO for a second time. Doe 1 underwent a forensic examination for alleged victims of sexual abuse (SART exam) at Children's Hospital in Oakland.

Garcia was arrested the same day. He was ultimately charged with two counts of committing lewd acts on Doe 1 and two counts of committing lewd acts on Doe 2 when they were under 14 years old (Pen. Code, § 288, subd. (a)); one count of committing forcible lewd acts on Doe 1 and one count of committing forcible lewd acts on Doe 2 when they were under 14 (*id.*, § 288, subd. (b)(1)); two counts of sexual penetration and one count of oral copulation with Doe 2 when she was 10 years old or younger (*id.*, § 288.7, subd. (b)); and two counts of intercourse or sodomy with Doe 1 when she was 10 or younger (*id.*, § 288.7, subd. (a)).

## C. Garcia Is Tried and Convicted

A jury trial was held in 2022. Mother, Doe 1, and Doe 2 testified about the charged offenses and related events. The People's expert witnesses testified about Doe 1's SART exam, which was inconclusive, and issues related to child sexual abuse.

As we will discuss, the People also presented testimony concerning Garcia's alleged sexual abuse of other children in his family. Stepdaughter K. was the first witness and testified over the course of two days about Garcia's abuse beginning when she was "five, going on six" years old. In addition, three of Sister's four children testified that Garcia had abused them during the time their families were in contact.

1.    *Doe 1's Testimony*

Doe 1 was 15 years old at the time of trial. Her first memory of Garcia's abuse was when she was "like, seven" years old, living in Hayward

4

with another family. She "was laying [*sic*] down on the bottom bunk bed, and [Garcia] came and slept with" her. Garcia "started touching [her] vagina" under her underwear, "[i]nside" the lips. Doe 1 didn't remember anything happening in San Leandro or at her aunt's in Castro Valley. She next remembered lying on the couch with Garcia at the Hayward Residence when she was "eight, [or] nine" years old. Garcia was "caressing" her vagina with his hand, under her underwear.

Doe 1 testified that Garcia also touched her with his "penis," more than one time. Once, at the Hayward Residence, he "made [her] get on [her] fours" and touched his penis "[i]nto" her "butthole," "[b]ack and forth," for "minutes." It "hurt." Doe 1 thought she was "eight [or] nine" at the time. She also remembered "another time" this happened "on the couch," before the time in the bedroom. This was also at the Hayward Residence, and Doe 1 did not remember how old she was, but said it was before her eleventh birthday.

Doe 1 was 11 when she told Mother about the abuse in February 2018, and thought Garcia was a "good father." At trial, she recounted how Garcia touched her vagina under her clothes when she was sleeping in the living room the night before she told Mother. Later, Doe 1 testified that on that night, Garcia also "pulled [her] arms, and he put [her] hand inside his pants, underneath his underwear" and made her "grab his penis and move it for him." When Mother "flashed [a] light" at them, Garcia "pushed [her] away and said go to sleep and pray." Doe 1 described how Mother asked her the next morning if Garcia "touch[ed]" her and she told Mother that he did and that she also "s[aw] him do[] it once to [Doe 2]."

The prosecutor played a video of Doe 1's subsequent 2018 CALICO interview for the jury. In the interview, Doe 1 described how Garcia had abused her the night before by making her touch his "cola" (which she said

5

Garcia used to "do pee") and touching her "cola," and said he had done this "a lot of times" in the past, beginning when she was "like, in first grade." He would also shake his "cola" and have her shake it, put his "cola" on top of hers through their clothes, kiss her on her mouth, and touch her "private part" inside her clothes. Doe 1 also said Garcia put his "cola" in her "cola," but then said she "got confused" and he only put it "on top of [her] clothes but not inside." Doe 1 also said Garcia had been "touching" Doe 2 "like, when she was in fifth grade too."

Doe 1 testified that Garcia was already touching her when she was interviewed by CALICO in 2015, but she told her interviewers she felt safe at home because she "was scared that [her] mom was going to get mad at [her]." She explained that when she said in her 2018 CALICO interview that Garcia would "put his cola on top of [her] cola," she meant that "he would put it inside [her] vagina," inside the cavity, and she and Garcia were not wearing clothes. She remembered this happening "like, twice." She did not remember when it happened but was "pretty sure it was before [her] 11th birthday." On cross-examination, Doe 1 stated that she "d[id]n't remember" many details about the times when Garcia put his penis in her vagina.

Doe 1 testified that, when she was about eight years old, she saw Garcia lying on the couch with Doe 2 and saw his hand moving between Doe 2's stomach and her thigh through a partial opening in the blanket that covered them. Garcia was already touching Doe 1 on the vagina at this time, and she "thought of what he did to [her], so that made [her] think that he was doing it to [Doe 2]."

Doe 1 testified that she told Mother, Doe 2 and Stepdaughter K. what happened to her beginning when she told Mother in 2018. Doe 1 "d[id]n't even know who" Sister was and did not remember her or her children.

### 2. *Doe 2's Testimony*

Doe 2 was 19 years old at the time of trial. Her first memory of Garcia's abuse was when she was "like, five or six," living in Oakland. She was in Mother and Garcia's bedroom, and believed she "was on top of [Garcia]" on the bed, on her knees with Garcia's "stomach . . . in between [her] legs." Garcia was "rubbing" her vagina with his hand. She didn't remember if he was rubbing over or under her clothes. Garcia told her that she "couldn't tell [her] mom." This happened "[v]ery often" when Doe 2 was growing up, "maybe like every other week," and Garcia would touch "[b]oth" over and under her clothes.

Doe 2 testified about another incident, at her aunt's (presumably, Mother's aunt) in Castro Valley. It was before she turned 10, and she and Garcia were both sitting on the couch. Garcia "grabbed . . . [her] arm" and "tried to sit [her] back down, and [she] was trying to get up" but "he wasn't letting [her]." Garcia "just turned [her] around," laid her down on her back, "and he got on top of [her]." She was "[s]cared" because Garcia had never failed to "let [her] go" when she "tried to get up or get away" before that day. Garcia put "his hand inside [Doe 2's] underwear" and started "rubbing" her "vagina." His fingers went "[i]n between" the lips of her vagina.

Doe 2 recounted another time when Garcia touched her, in San Leandro. She "was sleeping in the living room with [Stepdaughter K.], and [they] were supposed to be sleeping already." Garcia came out and sat next to her, and she "pretended [she] was sleeping." "[H]e grabbed [her] hand" and "started rubbing his . . . penis with [her] hand," under his clothes. This was in "[l]ike 4th or 5th grade," before she turned 11 when she was in middle school.

7

Doe 2 described another time in San Leandro, when she "was laying [*sic*] down on the floor" in the living room. Garcia "took [her] pants off" and "started licking [her] on [her] vagina." This was in "[l]ike, 4th grade," when Doe 2 was about nine years old. Another time in San Leandro, on "[her] and [Stepdaughter K.]'s bed," Garcia touched her vagina and put his fingers between the lips of her vagina. He then put his "hard" penis "like, right on top of" her vagina, but his penis did not go inside her vagina. Doe 2 testified that Garcia would also rub his hard penis against her butt when she was washing her hands in the bathroom, and this happened more than 10 times.

Doe 2 explained that, once the family moved to the Hayward Residence, Garcia continued to touch her "[i]n her vagina" the "same way" she had described, but "[n]ot as often," perhaps "every other month." By the time Mother asked Doe 2 in 2018 if Garcia had touched her, the touching "had stopped." Doe 2 did not tell anyone about the touching before this.

Doe 2 testified that she told her CALICO interviewer in 2015 that she felt safe at home, but she lied because she was "scared," and "didn't want to lose [her] mom" or for "anything bad to happen to [her] sisters." During her 2018 CALICO interview, Doe 2 reported that Garcia had touched her vaginal area. This was the first time she had really talked about the abuse; she told CALICO about fewer acts of abuse than she described in her trial testimony because she was "a little more scared" and "just didn't want to talk about it."

Doe 2 remembered "one time" when she saw Garcia do something that made her think he was touching Doe 1, at the Hayward Residence. She came into the living room where Garcia was sitting with Doe 1 under a blanket, and "when [Doe 2] came out, he, like, . . . jumped a little. Like, he got scared, and . . . got his [hands] out . . . from underneath the blanket." Doe 1 "looked scared too."

8

Doe 2 testified that, at the time of trial, she still had not talked about what happened to her with Mother, Stepdaughter K., or Doe 1. Doe 2 remembered living with Sister and her children, but last saw them when she was "maybe 8" years old and "didn't speak to them anymore" after that. She didn't tell Sister or her children what Garcia did to her. When the prosecutor asked if anyone ever told her anything Garcia did to Sister's family members, Doe 2 stated, "[N]o. I don't remember."

3. *Defense Case*

The defense called three witnesses. The first was Garcia's former pastor, who testified he had never seen Garcia act inappropriately around children. Garcia's second witness, his former boss at an automobile detailing business, said the same. The final defense witness was the social worker who investigated Stepdaughter K.'s allegations in 2015. She testified that her report from that time indicated that Mother doubted Stepdaughter K.'s allegations and reported Stepdaughter K. was "impressed" by her foster home, which had a dedicated bathroom and a "spacious room for her and her sister." The report indicated that Mother said Stepdaughter K. had admitted to making up her allegations.

4. *Closing Argument and Verdict*

In closing argument, the prosecutor urged that Garcia's several victims had no motive to lie and emphasized the similar allegations by children from two "different households." She dismissed Garcia's character witnesses as "useless."

Garcia's counsel argued that the People's witnesses were not "lying necessarily," but "simply unreliable." He posited that Mother might have "let her thoughts run wild when she thought she saw something" on the night before she confronted Doe 1, and Doe 1 might have simply agreed. Counsel

9

emphasized differences between the witnesses' own accounts of Garcia's abuse, focusing in particular on Doe 1's allegations of sodomy. He claimed Doe 1's allegations got "worse and worse and worse" as time went on, as did Doe 2 and Stepdaughter K.'s allegations. And the three had "all talked about the allegations" at some level of detail: "[T]hey certainly know about it, and . . . believe the others," so it "would not be unreasonable for them to back each other up [and] adopt each other's story"—particularly because they claimed Garcia was "too strict" and subjected them to corporal punishment.

The jury found Garcia guilty of all charges except the two counts of intercourse or sodomy with Doe 1, which the prosecutor dismissed after the jury was unable to reach a verdict on those counts. Garcia was subsequently sentenced to a term in prison of 54 years to life.

## II. DISCUSSION

### A. Peremptory Challenge

Garcia claims the trial court erred in overruling his counsel's objections to a peremptory challenge the People used to remove a black prospective juror. As we will explain, the court's ruling under Code of Civil Procedure section 231.7[1] was correct because "in the totality of the circumstances, . . . there is not a substantial likelihood that an objectively reasonable person would view cognizable group membership as a factor in the prosecutor's peremptory challenge." (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 546 (*Jimenez*).)[2]

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

[2] It follows that there was no constitutional violation either (see *Jimenez, supra,* 99 Cal.App.5th at pp. 547–549 & fn. 4), and since Garcia does not claim we should find one standing apart from the asserted statutory violation that is the entire focus of his argument on appeal, we need not address the issue any further.

10

1. *Legal Background*

Section 231.7 prohibits the use of a peremptory challenge "on the basis of [a] prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation," or "perceived membership . . . in any of those groups." (§ 231.7, subd. (a).) The statute is designed to address both purposeful discrimination and implicit unconscious bias in the jury selection process, and is "to 'be broadly construed' " to eliminate both forms of discrimination and " 'the use of group stereotypes' " in the exercise of peremptory challenges. (*People v. Uriostegui* (2024) 101 Cal.App.5th 271, 277–278, 281.)

Per subdivision (b) of the statute, a party may object to another party's peremptory challenge as improper on the ground that it seeks to remove a prospective juror based on a prohibited factor. The party seeking to challenge the prospective juror must then "state the reasons the peremptory challenge has been exercised." (§ 231.7, subd. (c).) The trial court must evaluate "the reasons given to justify the peremptory challenge in light of the totality of the circumstances," considering "only the reasons actually given" and not any "other possible justifications." (*Id.*, subd. (d).) If the court finds "a substantial likelihood that an objectively reasonable person would view race" or another prohibited characteristic "as a factor in the use of the peremptory challenge, then the objection shall be sustained." (*Ibid.*) The court must explain the reasons for its ruling on the record. (*Ibid.*)

Subdivision (e) of the statute lists 13 reasons that are presumed to be invalid if given as the justification for a peremptory challenge. A party that relies on one of those reasons must "show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race" or other prohibited factor, "and that the reasons

11

articulated bear on the prospective juror's ability to be fair and impartial in the case." (§ 231.7, subd. (e).) To find the presumption overcome, "the factfinder shall determine that it is highly probable that the reasons given . . . are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case." (*Id.*, subd. (f).)

The denial of an objection under section 231.7 is reviewed de novo, "with the trial court's express factual findings reviewed for substantial evidence." (§ 231.7, subd. (j).) The reviewing court "shall not impute" any findings to the trial court that the court "did not expressly state on the record." (*Ibid.*) The appellate court is to "consider only the reasons actually given under subdivision (c) and shall not speculate as to or consider reasons that were not given to explain . . . the party's use of the peremptory challenge." (*Ibid.*) If the reviewing court concludes the objection was overruled in error, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid.*)

2. *Factual Background*

Prospective juror D.M. was a 27-year-old, high-school-educated black man who worked as a mover. In his questionnaire, he responded "no" to questions about whether he, a family member, or a close friend had experiences that would impact his ability to serve as a fair and impartial juror, or had testified in a case "involving allegations of sexual assault, sexual misconduct, or child molest." He also answered "no" when asked if he had an opinion about "whether allegations of sexual assault or child molest should be treated differently from other crimes" or "whether victims of sexual assault or child molest are more or less believable" than victims of other crimes. But when asked whether "any publicized sexual assault cases caused [him] to

12

have any thoughts about the believability of sexual assault victims, defendants, or the prosecution of sexual assault cases," he responded "yes" and explained, "The deshaun watson case and how it was gone about confused me." (*Sic*.)[3]

D.M. was briefly questioned by both the prosecution and the defense during voir dire. The prosecutor asked him about his questionnaire response concerning a hypothetical conviction based solely on the testimony of one witness. D.M. had responded that "yes," such a conviction would be unfair, and explained that one person's account "could be different from another's if there are multiple testimonies then they all be held in account." (*Sic*.) D.M. told the prosecutor, "I would just kind of have uncertainties, but I don't think it will be a problem."

Garcia's counsel asked D.M. about his "thinking about the Deshaun Watson case." D.M. explained, "[O]nce he stated his opinion about the franchise and how he wanted to leave, . . . the next day it was just, like, what, 12 or . . . I don't know. It just seemed kind of funny, kind of weird." Counsel asked, "Timing was kind of suspicious, right?" and D.M. agreed, "Yes, yes." Counsel asked whether D.M. thought "there might have been some motive by some of the accusers," and D.M. replied, "Um, a little bit." D.M. continued, "I wasn't there, so I was just getting all the information like everybody else was. And it was just . . . [¶] . . . [¶] . . . the timing of it was kind of crazy." Counsel interrupted these comments and asked, "generally speaking, though, do you think sometimes accusers have motive[s] other than . . . coming out with the

---

[3] On our own motion, we take judicial notice of the fact that media outlets reported that Watson, a professional football player, was accused of sexual assault by several women. (Evid. Code, § 452, subd. (h); *Sexton v. Apple Studios LLC* (2025) 110 Cal.App.5th 183, 193–194 [granting judicial notice of publicity concerning production of television series].)

13

truth?" D.M. responded, "Some can. I'm not going to say everybody does." Counsel asked for some potential motives and D.M. stated, "I don't know how to explain it, like clout. . . . [¶] . . . [¶] . . . Some people might want more fame, to be known, or maybe other incentives. I don't know. Who knows." At this point, Garcia's counsel moved on to question other potential jurors.

The People exercised a peremptory challenge against D.M. and Garcia's counsel objected under section 231.7. The trial court directed, "[A]s the law works right now, there is not a prima facie requirement. It just goes straight to [the] government to give their reasons for exercising a peremptory."

The prosecutor offered "two reasons" and argued neither was presumptively invalid under the statute. First, she explained, D.M. was "a young man with very little life experience," which would make it difficult for him to "evaluat[e] the credibility of the witnesses and look[] at the totality of the circumstances." She noted that she also intended to challenge "the other 20-something male in the jury panel," and it was permissible to rely on "lack of life experience and young age when exercising a peremptory." While this factor, "on its own, wouldn't necessarily have been enough" to cause her to challenge D.M., a second reason "push[ed] [her] over the edge" when D.M. "cited to the Deshaun Watson case as the only case that he brought up regarding publicized sexual assault cases. And then when questioned in Court, indicated the timing was odd and it made him distrust that process." The prosecutor explained, "While he didn't say he wouldn't believe anyone, the fact that that's the only case that he cited . . . and it was one where he did not believe the victims is a cause for concern for the People."

Garcia's counsel argued that D.M. did not say anything to indicate he "would not believe people who make allegations of sexual assault." Counsel observed that "there wasn't much voir dire [by] the prosecution" about D.M.'s

14

"age or his experience." He faulted the prosecutor for failing to ask about what D.M. "does at work, what his other experiences may be outside of work or school." The prosecutor responded to "the point with life experience" by explaining, "[W]e have . . . an individual who has no children, and didn't indicate any lengthy employment history that would demonstrate contact with the community . . . in a great deal to indicate further life experience similar to the other juror, who is simply in tech and doesn't indicate experience interacting with the community a great deal either."

The trial court explained that it had considered "all the factors" under section 231.7 and must evaluate "the totality of circumstances [to] determine whether there is a substantial likelihood that an objectively reasonable person" would view race "as a factor in the use of the peremptory challenge." The court determined that none of the "presumptively invalid reasons under th[e] statute" were implicated by the prosecutor's statement. The court acknowledged that D.M. seemed like a reasonable person and opined that his responses would not support a challenge for cause. It continued: "[I]n a case like this, . . . there may be several different scenarios for which [D.M.] was subjectively . . . excused." Still, the court was clear that it was "required by the statute not to speculate or assume certain things, so I'm not." It concluded that "under the totality of circumstances, and under the new standards" of section 231.7, "the defense or moving party's burden of showing a substantial likelihood that this challenge was that an objectively reasonable person, that the challenge was based on race has not been met." (*Sic.*)

3. *Explanation of Reasons*

On appeal, Garcia claims the trial court failed to expressly "review" the reasons given by the prosecutor for the peremptory challenge and improperly

15

speculated she might have excused D.M. for " 'several different scenarios.' " As Garcia acknowledges, the court actually said it would *not* "speculate or assume" about potential justifications unstated by the prosecutor. Garcia offers only his own speculation that the court did the opposite of what it said, which we do not consider. (See *People v. Pearson* (2008) 165 Cal.App.4th 740, 748–749 [rejecting speculation that the trial court "relied on its 'personal feelings' rather than the evidence" where the record did not reflect the court acted arbitrarily or abused its discretion].)

As for the court's comprehensiveness, section 231.7 only requires it to "explain the reasons for its ruling on the record," without requiring it do so in any particular manner or at any particular level of detail. (§ 231.7, subd. (d)(1); see *People v. SanMiguel* (2024) 105 Cal.App.5th 880, 891, review granted Dec. 18, 2024, S287786 [even where challenging party cites a presumptively invalid reason, "[i]t is not necessary for the trial judge to specifically say on the record, ' "I find by clear and convincing evidence the reasons . . . bear on the prospective juror's ability to be fair and impartial" ' "].) We, in turn, must decide if an objection was properly denied by considering the "reasons actually given under subdivision (c)" *by the prosecutor*. (See *People v. Ortiz* (2023) 96 Cal.App.5th 768, 799–800 (*Ortiz*) ["a reason is 'actually given' under section 231.7, subdivision (c)" if "the party exercising the challenge states the reason before the trial court rules on the objection"].) The statute does not require the trial court to repeat these reasons as part of its ruling, and it "does not limit our ability to consider undisputed facts in the record that are relevant to the prosecutor's reason or the court's finding during our de novo review." (*Jimenez, supra,* 99 Cal.App.5th at p. 544.)

16

Here, the trial court correctly charged the People with "giv[ing] their reasons for exercising a peremptory," without the need for any initial showing by the defense. While its ruling was brief, the court said it had considered "all the factors" under section 231.7. It expressly found that "under the totality of circumstances, and under the new standards" of section 231.7, there was no showing of a substantial likelihood that an objectively reasonable person would view race as a factor in the use of the peremptory challenge. There is nothing facially deficient about that conclusion.

4. *Burden of Proof/Presumptively Invalid Reasons*

Garcia next claims the trial court employed an incorrect standard because it stated that he bore the burden to prove an objectively reasonable person would view race as a factor in the challenge, when the People bore the burden under section 231.7, subdivision (e). However, subdivision (e) assigns the burden to the party exercising a peremptory challenge only when that party relies on a presumptively invalid reason.

Here, the court determined that the prosecutor did not rely on a presumptively invalid reason to challenge D.M. Consistent with this determination, the reasons offered by the prosecutor—D.M.'s youth and lack of life experience, and his views about allegations of sexual assault against a famous athlete—are not among the 13 presumptively invalid reasons set forth in subdivision (e). Garcia did not argue otherwise to the trial court, nor object to its determination that subdivision (e) did not apply. He thus forfeited any argument that the prosecutor relied on a presumptively invalid reason to justify her peremptory challenge. (See *People v. Jaime* (2023) 91 Cal.App.5th 941, 946 [confirming forfeiture would generally apply where appellant failed to make a specific objection under section 231.7]; *People v. Cunningham* (2015) 61 Cal.4th 609, 662 [failure to clearly articulate the basis

17

for a *Batson/Wheeler* objection to a peremptory challenge forfeited the issue].)

Garcia similarly forfeited any claim of prejudice from the trial court's statement that he bore the burden to prove the challenge was improper. Section 231.7 does not expressly assign the burden to one party or the other when the challenging party does not rely on a presumptively invalid reason, and Garcia does not address this issue in his appellate briefing or explain how he was prejudiced where the court said it had considered all of the statutory factors. (*Lake Lindero Homeowners Assn., Inc. v. Barone* (2023) 89 Cal.App.5th 834, 838, fn. 2 (*Barone*) [claims unsupported by "reasoned argument," "citation to relevant legal authorities," or discussion of prejudice were forfeited].)

5. *Totality of the Circumstances*

We consider the circumstances set forth in the statute, among any others that are relevant, to determine whether an objectively reasonable person would view race as a factor in the use of the peremptory challenge to D.M. (§ 231.7, subd. (d)(3) [court may consider the statutory circumstances but is not limited to those circumstances].) Many circumstances that might weigh in favor of that finding are not present here. First, Garcia and his victims, who the prosecutor described as Hispanic, and D.M., who is black, were not part of the same perceived cognizable group, and there is no suggestion that race bore on the facts of the case. (*Id.*, subd. (d)(3)(A) & (B).) There is also no indication that age and inexperience or skeptical views about sexual assault allegations against a famous athlete are disproportionately associated with race. (*Id.*, subd. (d)(3)(E).) Additionally, there is no evidence the prosecutor's office had a history of using peremptory challenges

18

disproportionately. (*Id.*, subd. (d)(3)(G).) Garcia does not argue that any of these factors were present.

Garcia claims the prosecutor's failure to question D.M. about either of her stated concerns weighs in favor of a finding that a reasonable person would view race as a factor in her challenge. (§ 231.7, subd. (d)(3)(C)(i) & (ii) [court may consider failure to question prospective juror about the cited concerns and/or cursory questioning]; see *People v. Hinojos* (2025) 110 Cal.App.5th 524, 546 [these factors originate from case law establishing that lack of " 'meaningful voir dire on a subject of purported concern can, in some circumstances, be circumstantial evidence suggesting the stated concern is pretextual' "].) As we have discussed, the prosecutor explained why she did not believe questioning about age and experience would be fruitful, and there was little need to question D.M. about the Watson allegations given that Garcia's own counsel did so at length. (See *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1163 [prosecutor's failure to specifically question prospective juror on stated concerns was of " 'little or no consequence' " since she answered pertinent questions by the court and defense counsel].) These were legitimate concerns unlikely to be alleviated with further voir dire questioning. (See *People v. Miles* (2020) 9 Cal.5th 513, 544–545 [failure to question prospective juror "about 'each and every area of articulated concern[]' . . . does not necessarily demonstrate that those concerns were pretextual," particularly where " 'questionnaire responses . . . spoke for themselves' "].)

Nor did the prosecutor mischaracterize D.M.'s views and experience as Garcia claims. (§ 231.7, subd. (d)(3)(F).) While Garcia urges that D.M. worked as a cashier for three years before he began working as a mover, the prosecutor's view that this was not a "lengthy employment history that would

19

demonstrate [a great deal of] contact with the community" was fair.  While her statements that D.M. "did not believe [Watson's] victims" and "distrust[ed] that process" were based on inferences, the prosecutor did not mischaracterize D.M.'s apparently skeptical views of those allegations.  After all, D.M. called the timing of the Watson allegations "weird" and suspicious, said the accusers might have a motive, and stated that while not all accusers have ulterior motives, some might "want more fame, to be known, or maybe other incentives."

Finally, we are unconvinced by Garcia's argument that the prosecutor failed to challenge seated jurors similar to D.M. who were not black.  Garcia urges that three jurors did not have children, but it was D.M.'s overall youth and inexperience rather than his lack of children per se that the prosecutor cited.  And one of these childless jurors *was* black—to the extent Garcia suggests he was of a different "race" than D.M. because he was born in Ethiopia, we are not persuaded.  (§ 231.7, subd. (a).)  Garcia takes a similar approach to arguing that seated jurors expressed "uncertainty" about the criminal justice system.  It was not D.M.'s expression of general uncertainty about or distrust of the legal system that the prosecutor relied on (which would have been presumptively invalid under section 231.7, subdivision (e)(1)), but his apparent mistrust of alleged victims of sexual assault.  And again, one of the skeptical jurors Garcia identifies was black: Garcia fails to explain why it matters that she was also female.  Garcia mentions three other jurors "closest in age" to D.M. (all at least four years older) but doesn't explain why they should be viewed as equally young and inexperienced based on their current jobs alone.

As the People point out, there were three black individuals on the jury.  Two jurors identified as Hispanic.  All of the jurors were meaningfully older

20

than D.M., and all but one were over 40.  11 of the 12 jurors checked the "no" answer to or left blank the questionnaire entry about whether a publicized case affected their assessment of sexual assault victims' credibility.  The remaining juror referenced the "Jon Benet case" and said that case was "a mess," but explained that it did not impact his views on the criminal justice system because "[i]t's not a perfect world."  These responses do not suggest skepticism of sexual assault victims like D.M.'s did.

We find no reason that a reasonable person would view D.M.'s race as a factor in the prosecutor's peremptory challenge.  The trial court correctly overruled Garcia's objection.

## B.  Evidence Concerning Uncharged Acts of Abuse

Garcia claims the trial court erred by allowing the People to introduce evidence of uncharged acts of abuse alleged by Stepdaughter K. and three of Sister's children.  He contends that the court failed to properly exercise its discretion to admit or exclude the evidence under Evidence Code sections 352 and 1108, which rendered his trial fundamentally unfair in violation of his constitutional rights.  We find no error.

### 1.    *Legal Background*

"Subject to Evidence Code section 352, Evidence Code section 1108 permits a jury to consider prior incidents of sexual misconduct for the purpose of showing a defendant's propensity to commit offenses of the same type, and essentially" to "determin[e] whether the defendant is guilty of the current sexual offense charge."  (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1096.)  "[T]here is a strong presumption in favor of admitting . . .

21

evidence under Evidence Code section 1108 to show propensity to commit charged crimes." (*People v. Merriman* (2014) 60 Cal.4th 1, 62 (*Merriman*).)

To determine whether such evidence is admissible, "trial courts must engage in a 'careful weighing process' under [Evidence Code] section 352." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823–824.) The court's "determination should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the . . . offenses, or excluding irrelevant though inflammatory [surrounding] details.' " (*People v. Dworak* (2021) 11 Cal.5th 881, 900 (*Dworak*).) We review the trial court's decision to admit such evidence for abuse of discretion. (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 824.)

2.     *Stepdaughter K.'s Testimony*

Stepdaughter K. was 20 at the time of trial. She testified that Garcia began "touching under [her] clothes" when she was "five, going on six" years old, in Union City. The first time she remembered, she was lying down to take a nap next to Garcia and Doe 2 one afternoon. Garcia started touching her leg, then put his hand inside her shorts and underwear and touched between the lips of her vagina for "[m]inutes" while Doe 2 was sleeping. Another time in Union City, Garcia hugged Stepdaughter K. from behind and rubbed his hard penis against her. He then laid her down on the floor, got on top of her, and touched her vagina under her clothes. Stepdaughter K. testified that Garcia "constantly" touched underneath her underwear while

she was napping or sleeping.  She also remembered one time when he placed her hand on his erect penis, and then "made [her] put [his penis] in [her] mouth."

When Stepdaughter K. was in first grade and living with Sister's family in Oakland, Garcia unzipped the skirt of her school uniform and touched her vagina under her underwear while they were in a bedroom with Doe 1.  He stopped when Sister's daughter P. came upstairs or knocked.  P. "questioned" why Stepdaughter K.'s skirt was unzipped, but Stepdaughter K. "didn't say anything."  She never told Sister's children about her allegations against Garcia and they never told her about theirs.

Stepdaughter K. recounted several more acts of abuse by Garcia, including one time when he "licked" her "private area" at her aunt's in Castro Valley, and once when he "tried putting his private part in . . . [her] butt," but stopped when she "said ow."  In San Leandro, Stepdaughter K. awoke "because [she] felt someone touching [her] private part."  Garcia "was right there, but . . . point[ed] at [Doe 2], like" she had touched Stepdaughter K.  The last incident Stepdaughter K. recounted happened when she lived at the Hayward Residence.  Garcia took Stepdaughter K. to Wal-Mart in his car, pulled over on the side of the road on the way home, and started touching her private area and kissing her mouth.

The prosecutor played video from Stepdaughter K.'s 2015 CALICO interview, when she was 13.  She told the interviewer that when her best friend confided that she was being abused by her own stepfather, Stepdaughter K. told her friend "the same thing" about herself and they "kept it a secret between each other" for a while.  After her best friend reported being abused and went to "a safe place," another friend told Stepdaughter K. to talk to the school counselor about her own abuse " 'cause it could get

23

worse,' " and she did. Stepdaughter K. told the CALICO interviewer that Garcia had been touching her "[i]n a way [she] didn't want to be touched" since she was around six years old. She said she didn't remember the details. But in the "last months," she remembered that Garcia touched her "private areas" while she was asleep. An earlier time, he touched her "breast" and "vagina" while she was sleeping and then "pointed at [her] sister" who was sleeping nearby. Another time, Garcia took Stepdaughter K. shopping and while they were in the car, he started rubbing her breasts with his hands over her clothes. She took his hands off and he stopped.

The prosecutor showed video of a subsequent interview of Stepdaughter K. by the police. In that interview, officers pressed her about whether she told the truth about Garcia, and she said that she did and again related allegations about how he touched her. But soon after, Stepdaughter K. told Mother she had been lying, and recanted her allegations in another interview with police. She told the officers she accused Garcia because she thought it would allow her to be with her best friend. At trial, Stepdaughter K. explained that she recanted because she was told she and her sisters would go to a shelter, and she felt guilty after Doe 1 told her she missed Garcia.

Stepdaughter K. returned to the Hayward Residence, but ran away, was "in and out of . . the mental hospital," and would "cut [her]self" and take pills. In 2016, she was again interviewed by police after her boyfriend's grandmother reported that she had alleged abuse by Garcia. She told the officer that her initial allegations in 2015 were true and it was a lie when she recanted. Stepdaughter K. did not know whether any charges were filed in 2016, and told the prosecutor she did not know that she was not a named victim in the present case against Garcia.

24

3.  *Testimony Concerning Sister's Children*

Sister had four children: P. (who did not testify at trial), Nephew M., Nephew J., and Niece L.

Nephew M. was 25 at the time of trial. He testified that when he was "six or seven" years old, he was in the shower with Garcia and Nephew J., and Garcia rubbed his penis against Nephew M.'s butt while rubbing Nephew M.'s penis with his hand. Later, Nephew M. helped Garcia move to Fruitvale. On the day they moved items in to that residence, Garcia removed Nephew M.'s clothing and pulled his own pants down. He rubbed his penis on Nephew M.'s butt and "ejaculate[ed] himself." Garcia told Nephew M. that if he "said anything to [his] parents," Garcia "would tell [Sister] . . . he was going to hurt [Nephew M.]," but if Nephew M. "kept [his] mouth shut, [Garcia] would pay [him]." After the move, Nephew M. would sleep over at the Fruitvale house, and Garcia woke him up one night by rubbing his penis and putting his hand on Garcia's penis. Then, when he was "eight, [or] nine" years old, Nephew M. helped Garcia with his move from Fruitvale to Hayward. Garcia did "[t]he same" to Nephew M. as he did during the move to Fruitvale: "Turned [Nephew M.] around, rubbed his penis against [Nephew M.], and then he ejaculated."

Nephew M. testified that after Garcia abused him, Nephew M. "did the same thing" to his younger sister, Niece L. This was reported to the police when Nephew M. was about nine years old. Nephew M. was interviewed by CALICO in 2008 and said a friend of his mother's boyfriend had abused him, but at trial he said this was false. He was interviewed by CALICO again in 2010 and described a different act of abuse by Garcia than the ones he recounted during trial.

25

Niece L. was 20 at the time of trial. She testified that she was placed in foster care because of the abuse by Nephew M., and she eventually alleged abuse by Garcia to a foster parent and then Sister. Niece L. had asked the prosecutor to ask her as few questions as possible. But she agreed to watch the video of her interview at CALICO when she was 11, which the prosecutor played for the jury.

In that interview, Niece L. said that when she was four to seven years old, Sister would leave her and her brothers at Garcia's house while Sister would go grocery shopping. One time, Niece L. peed on the carpet because the bathroom was occupied. Either Garcia or his wife "dragged [her] into the bathtub and they just opened like water" that was "freezing cold." Niece L. said she was "all wet" but "had to wear the same clothes 'cause they didn't even give [her] clothes." But later in the interview, she said Garcia and his wife "took [her] clothes off." Niece L. also claimed Garcia took her into his room, "locked the door," "tied . . . [her] legs" and "arms," and "touched [her] parts, and [she] just kept yelling and like nobody would come in." She thought Garcia tied her with "his belts or socks," and he "hit [her] if [she] moved" and "put a sock in [her] mouth so [she] would be quiet." Garcia "pulled [Niece L.'s] pants down," "kept like squishing . . . [her] breast" and her "butt," and touch[ed]" and "pok[ed]" her vagina. After Garcia removed the sock from her mouth, Niece L. asked why he was doing this. He said, " 'Cause you're not a perfect child,' " and "kept hitting [her]." Niece L. also described being "hit" and "whopped," including with a "cable" and "hangers," when one of Mother's daughters "did something wrong and they blamed it on [her]." She said Garcia hit Mother's daughters if they failed to do their schoolwork correctly. Niece L. said that Garcia touched her on her body "more than like ten times," or "[n]ot ten times but like five or two." Once was when

26

she was using the bathroom and he "burst in" and touched her "on [her] vagina and on [her] breast," over her clothes. When she asked Garcia why he was touching her he said it was because he told her not to use the bathroom. He hit her and told her it was because she was " 'taking too long.' " Niece L. then said this bathroom incident was the only time Garcia touched her other than "the one on the bed."

Niece L. initially testified that she told the truth to her CALICO interviewer. But after watching the video, she said she was "confused" and "d[id]n't really remember anything anymore now that years have passed by." She testified that "maybe [she] did exaggerate a little bit," in particular as to "the time maybe, or like the hitting," but "[t]hat doesn't mean that the facts aren't true." Niece L. stated that she did remember that Garcia hit her, but she "d[id]n't remember" if he tied her up. It was the truth when she told CALICO that Garcia touched her vagina, breasts, and butt.

Nephew J., who was 24 at the time of trial, testified that Garcia abused him only once, when he was between nine and 12 years old. They were at a "kind of mechanic shop" that might have belonged to an "employer of [Garcia's]." They ate some food, then reclined on "[s]ome type of padding." Garcia "grabb[ed]" Nephew J.'s penis with his hand. Nephew J. did not remember anything else about what happened that day. He did not remember ever taking a shower with Garcia and was "pretty sure" Garcia never lived with his family.

4.    *The Trial Court's Ruling*

The prosecution filed a motion to admit the evidence of uncharged acts of abuse per Evidence Code section 1108. During oral argument on the motion, the prosecutor explained that Stepdaughter K., like Doe 1 and Doe 2, "had repeated and lengthy contact with [Garcia], because they all lived in the

27

same household for many years." She represented that Stepdaughter K.'s allegations "will be gone into detail less than the charged witnesses, but more than" Sister's children, whose testimony would be "more limited." Defense counsel objected, "particularly to" the testimony by Sister's children. He argued that their allegations happened "a while back" and did not overlap with the more recent charged acts of abuse; their testimony would not "add any probative value, if the Court's going to allow [Stepdaughter K.] to testify"; and the testimony would consume undue time and confuse the jury "with all the different dynamics going on," such as Nephew M.'s abuse of Niece L.

The trial court acknowledged that "with all these family relations and . . . all these years and years that this happened," the testimony "really has a potential to be quite confusing and time consuming." The prosecutor responded that Stepdaughter K.'s testimony had "significant probative value" because "she is sisters with the named victims" and "first reported [Garcia's] conduct." Her testimony was also important to explain why Doe 1 and Doe 2 did not initially report, because they "saw [what] happen[ed] to [Stepdaughter K.] when she did report." The court pressed the prosecutor on "why" she "need[ed] to call" Sister's children as well. The prosecutor responded that these witnesses were "significantly important," because they "have had no contact with" Doe 1, Doe 2, or Stepdaughter K. "[T]o believe that two different families, who have no contact with each other, have come up with the same . . . lie is unfathomable, and that is a significant point for jury to see." Garcia's counsel concluded his argument by reiterating that testimony by Sister's children would be "cumulative" to Stepdaughter K.'s testimony and "confusing." He did not argue that any specific portion of the proffered testimony should be excluded for any other reason.

28

The trial court prefaced its ruling by explaining that Evidence Code section 1108 "is there for a reason, and presumptively this kind of evidence is admitted in these trials." But the court was clear that the presumption was "subject to [its] discretion to try to mold . . . and limit" the evidence. The court ruled that evidence as to all four witnesses would be admitted but imposed time limits on the direct examination of Sister's children, given that "there's going to be a lot of testimony from the two main alleged victims plus [Stepdaughter K.]." The court observed that potential confusion would be minimized by appropriate "jury instruction" and jurors' ability to distinguish between testimony from different witnesses they saw "on the witness stand."

5. *General Objections to the Testimony About Uncharged Conduct*

Garcia claims the trial court improperly failed to ascertain the details of the testimony that would be offered and "just rel[ied] on the fact that the statute was enacted" and "a presumption" that the testimony was admissible instead of considering the factors described in case authorities. But as Garcia acknowledges, the court's application of a presumption was consistent with the standard described by our Supreme Court in *Merriman, supra,* 60 Cal.4th 1. The trial court also specifically recognized its "discretion" to "mold . . . and limit" the evidence, and discussed relevant factors like the testimony's probative value and potential to confuse the jury and consume undue time. These were the same factors that Garcia's counsel focused on, so "it is no surprise that the trial court's comments were directed to th[ose] issue[s]." (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285 (*Lewis*).) As for "relevant factors *not* mentioned by the trial court," the court was not required to " 'expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows [it] was aware of and

29

performed its balancing function under Evidence Code section 352.' " (*Ibid.*)
The record shows that here.

Substantively, the trial court was within its discretion to admit the
evidence concerning Stepdaughter K. and Sister's children. The evidence was
highly probative because it showed Garcia consistently abused children he
had access to in a similar manner.[4] (*People v. Hollie* (2010) 180 Cal.App.4th
1262, 1274 [a " 'principal factor affecting the probative value of an uncharged
act is its similarity to the charged offense' "].) As the court recognized, the
evidence was critical to rebut defense attacks on Doe 1 and Doe 2 based on
their failure to immediately report Garcia's abuse and the possibility that
they discussed or were influenced by one another's allegations. The
uncharged abuse largely predated, but was not too remote from the charged
offenses—indeed, Stepdaughter K., Doe 2, and Nephew M. all testified to
abuse that happened while Garcia was living in Oakland with Sister.
"Neither Evidence Code section 352 nor Evidence Code section 1108 contains
rigid requirements" that uncharged offenses be recently committed, and
" 'significant similarities between the prior and the charged offenses may
"balance[ ] out [any] remoteness." ' " (*People v. Cordova* (2015) 62 Cal.4th
104, 133 [commission of other sex offenses against young children "permits
the logical conclusion that defendant had a propensity to commit" such
offenses, "even if years separated the crimes"].)

Garcia claims this evidence should have been excluded because it was
cumulative, time-consuming, and confusing given the different standards of
proof applicable to the charged and uncharged acts of abuse. But the trial

---

[4] Garcia failed to argue otherwise in his opening brief on appeal, so we
need not address the new argument set forth in his reply brief. (*Tan v.
Appellate Division of Superior Court* (2022) 76 Cal.App.5th 130, 142, fn. 7.)
Still, we have considered his reply argument and simply disagree with it.

court considered these issues and found they were appropriately addressed through time limits on the direct examination of Sister's children, appropriate jury instructions, and letting the jurors hear from each of the witnesses so they could remember each of them and distinguish their testimony. We find no abuse of discretion in the court's assessment. While the lack of any criminal consequences from the prior abuse and the time it took to address it at trial weighed against admission, the court was well within its discretion to admit the evidence given the countervailing factors we have discussed. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404–405 [evidence of defendant's uncharged molestation of victim's older sister was properly admitted under Evidence Code sections 1101 and 352]; *People v. Falsetta* (1999) 21 Cal.4th 903, 919 [approving *People v. Soto* (1998) 64 Cal.App.4th 966, 991, which upheld admission of prior offense that was " 'extremely probative of appellant's sexual misconduct when left alone with young female relatives' "]; *People v. Escudero* (2010) 183 Cal.App.4th 302, 312 [trial court was not compelled to find undue consumption of time where testimony about prior sexual offenses constituted more than half of the testimony at trial].)

      6.    *Specific Objections to Particular Witnesses*

On appeal, Garcia argues that Stepdaughter K.'s testimony was "long-winded," consuming almost two days of trial; covered not only touching by Garcia but Stepdaughter K.'s lying and self-destructive behavior; and made it obvious that Garcia had not been punished for his abuse of Stepdaughter K. and of Sister's children. But Garcia forfeited these specific objections to Stepdaughter K.'s testimony by failing to raise them below, either in opposition to the motion to introduce her testimony or as the testimony proceeded during trial. (*People v. Thomas* (2023) 14 Cal.5th 327, 366–368

31

(*Thomas*) [general objection under Evidence Code section 352 to all evidence on a topic "not sufficient to preserve a claim as to specific pieces of evidence"].) In any case, we find no abuse of discretion in the trial court's decision to admit Stepdaughter K.'s testimony for the reasons we have already discussed.

Similarly, Garcia observes that it took over an hour to play the video of Niece L.'s CALICO interview to the jury, and claims the prosecutor exceeded the time limitation imposed on her direct testimony by doing so. But he did not object to this approach during trial. When the trial court asked why Niece L.'s testimony was taking so long, the prosecutor explained that her CALICO interview was separately admitted under Evidence Code section 1360 and Garcia raised no objection. Likewise, while Garcia now claims the evidence concerning Niece L. should have been excluded due to the "fantastical" and sometimes "physically impossible descriptions" she gave during her CALICO interview, he raised no such objection below. The prosecutor was clear that Niece L.'s testimony would focus on "her CALICO" interview, but Garcia raised no specific objection as to that interview, merely arguing that all of the evidence regarding Sister's children should be excluded as cumulative, time-consuming, and confusing. Garcia has forfeited his specific objections to the evidence concerning Niece L. We also find no abuse of discretion in the court's decision to admit it. Niece L.'s testimony and statement describing two acts of abuse were not unduly time-consuming or prejudicial compared to the long, wrenching accounts of years-long abuse by Mother's daughters.

Even if the trial court erred by admitting Niece L.'s account and the issue was not forfeited, this did not render his trial fundamentally unfair and the error was not prejudicial. (See *People v. Hin* (2025) 17 Cal.5th 401, 482

32

[analyzing these issues together].) We analyze the latter issue under the reasonable-probability test established by *People v. Watson* (1956) 46 Cal.2d 818, 836–837. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 357; see also *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1120.) Considering the number of children who accused Garcia and the similarity of their allegations, it is not reasonably probable that Niece L.'s statement affected the verdict. True, her account was an outlier in that she said Garcia physically restrained and hit her while abusing her. But Niece L. herself raised these inconsistencies, allowing she might have "exaggerate[d]" and did not remember if Garcia tied her up. The prosecutor similarly acknowledged during closing argument that Niece L. probably had not been physically restrained. Meanwhile, Niece L.'s brothers testified to abuse by Garcia that did not involve being hit or physically restrained and was generally very consistent with the accounts of Mother's daughters. There is no reason the jury would have discounted both brothers' accounts and relied only on the inconsistent and more inflammatory details of Niece L.'s statement to convict Garcia.

## C. Prior Statements

Evidence Code section 1360 "creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse." (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367.) "Section 1360 safeguards the reliability of a child's hearsay statements by requiring that: (1) the court find, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances surrounding the statement(s) provide sufficient indicia of reliability; (2) the child either testifies at the proceedings, or, if the child is unavailable to testify, other evidence corroborates the out-of-court

statements; and (3) the proponent of the statement gives notice to the adverse party sufficiently in advance of the proceeding to provide him or her with a fair opportunity to defend against the statement." (*Ibid.*)

Garcia claims the trial court failed to follow the appropriate procedure in admitting prior statements by Doe 1 and Niece L. under Evidence Code section 1360, violating his constitutional rights.[5] He argues that the court failed to conduct the hearing required by the statute or expressly find the statements bore sufficient indicia of reliability, which he claims they did not.

Garcia failed to object to the trial court's motion in limine ruling admitting the statements on either of these grounds. Rather, he objected "based on due process," "prejudic[e]," and "the confrontation clause." The court seems to have interpreted this as an objection to the constitutionality of the statute: "it seems that the legislature and the courts have already passed on those questions." Garcia's counsel did not clarify his objection or argue that the statements lacked sufficient indicia of reliability, but merely noted he would ask the court to revisit the issue if the witnesses did not testify at trial.

In his reply brief, Garcia essentially concedes that he failed to specify the grounds for his objection but claims a more specific objection would have been futile because the trial court understood the issues he wishes to raise. We disagree. Garcia's counsel made broad and general objections, followed by a comment about the need for the witnesses to testify at trial. There is no suggestion that the court understood this as an objection that a hearing and

---

[5] Garcia claims in his opening brief that Stepdaughter K.'s prior statements were also erroneously admitted under this section. But in his reply brief, he agrees with the People that Stepdaughter K.'s statements were instead admitted as prior consistent and inconsistent statements, and raises no issue with these rulings.

particular findings were required by the statute, or that there were specific concerns about the reliability of the statements at issue. These objections are forfeited. (See *People v. Hernandez* (1999) 71 Cal.App.4th 417, 424–425 [deeming waived objection that statements admitted under similar hearsay exception set forth in Evidence Code section 1370 lacked sufficient indicia of reliability].)

Garcia asks us to overlook his forfeiture of these objections and address the reliability of the witnesses' out-of-court statements. We might exercise our discretion to do so, but Garcia has doubly forfeited any argument that Doe 1's out-of-court statements were unreliable. He presents no relevant, substantive argument in his opening brief on appeal addressed to Doe 1's statements, merely urging that their admission "allowed the jury to hear her claims twice." We decline to consider the new argument Garcia raises on reply. (See *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693 ["Basic notions of fairness dictate that we decline to entertain arguments that a party has chosen to withhold until the filing of its reply brief, because this deprives the respondent of the opportunity to address them."].) As for Niece L., any error in the admission of her statement was not prejudicial for the reasons we have already discussed.

## D. Prosecutorial Misconduct

Garcia raises two related claims of misconduct by the prosecutor during closing argument. First, he argues that under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), it was misconduct for the prosecutor to preface her attack on the defense witnesses by stating, "I want to be clear in this following argument, I'm not talking about the defendant. He has an absolute constitutional right not to testify, and you're not to use that against him in any way." Second, Garcia claims the prosecutor's argument that he failed to

35

call other logical witnesses in his defense was improper and "suggested a duty to produce evidence to prove his innocence."

Garcia forfeited the first argument by failing to object based on *Griffin, supra,* 380 U.S. 609, at trial and objecting only based on "burden shifting." (*People v. Brown* (2003) 31 Cal.4th 518, 554.) Regardless, his *Griffin* argument is foreclosed by *People v. Tafoya* (2007) 42 Cal.4th 147, 184 (*Tafoya*), in which our Supreme Court found it was not misconduct for a prosecutor to simply "echo[] [a] standard jury instruction" on the defendant's constitutional right to choose not to testify. Garcia asks us to disregard this authority because "the prosecutor in the *Tafoya* case essentially repeated the jury instruction on this issue in a capital trial." But here, too, the prosecutor merely repeated the standard jury instruction that was given, CALCRIM No. 355. *Tafoya* is squarely on point.

As for his second claim, Garcia recognizes that " 'prosecutors may allude to the defense's failure to present exculpatory evidence' " and this "does not ordinarily violate *Griffin* or erroneously imply that the defendant bears a burden of proof." (*People v. Lewis* (2004) 117 Cal.App.4th 246, 257.) Here, the prosecutor argued that Garcia's "character evidence" was "useless" because the witnesses he called—his "priest" and "his boss"—were "people [Garcia] had to be on his behavior in front of." It was in this context that the prosecutor noted Garcia's failure to call witnesses who knew what he was like at home: "Where is the mother of his oldest child to say he never touched that child? Where is his former roommate to say he never saw anything weird with children? Where [are] his former lovers [to say] that he didn't have anything kinky or weird about his sexual preferences? Where is his mom to say [s]he didn't raise a child molester[?]" This was a permissible attack on the weaknesses of Garcia's character witnesses. (See *People v. Winbush*

36

(2017) 2 Cal.5th 402, 482 ["argument about the absence of a defendant's family members" as character witnesses was not misconduct but "permissible comment on the defendant's failure to call logical witnesses"].) There "is no reasonable likelihood the jury would have understood the prosecutor's remarks to suggest that defendant had the burden" to prove his innocence or to call these particular witnesses to the stand. (*Lewis*, *supra,* 46 Cal.4th at p. 1304.)

*People v. Woods* (2006) 146 Cal.App.4th 106 is not to the contrary. There, defense counsel attacked the credibility of an officer witness in closing argument. (*Id.* at p. 111.) The prosecutor responded by arguing that the defense " 'didn't bring one witness into this courtroom to say that [the officer] doesn't do [his job] properly.' " (*Id.* at p. 112.) The Court of Appeal confirmed that this portion of the prosecutor's argument was "unobjectionable." (*Id.* at p. 113.) But the prosecutor went on to claim defense counsel could not attack the officer's credibility and ask the jury to " 'take it as gospel,' " but was " 'obligated to put the evidence on from that witness stand.' " (*Id.* at p. 112.) "Defense counsel objected, adding that she was 'not obligated to do anything,' " but the trial court overruled the objection. (*Ibid.*) The Court of Appeal explained that "[t]he assertion that the defense had an 'obligation' to present evidence expressly and erroneously advised the jury that appellant bore some burden of proof or persuasion." (*Id.* at p. 113.) "The court not only failed to correct this misstatement, but overruled appellant's objection, thereby implying that the 'obligation' . . . actually existed. It is inconceivable that the jury would understand this uncorrected, implicitly approved statement to mean anything other than appellant carried a burden of proof or production." (*Id.* at pp. 113–114.)

Nothing like that happened here. The prosecutor prefaced her argument by explaining that "when the defense does put on witnesses, I can comment on the ones they did, and I can comment on the failure to call logical witnesses." That is exactly what she did with her argument. She concluded with the same point, that Garcia presented weak character witnesses: "As helpful as his priest and his employer can be, they don't get us very far." The prosecutor's closing argument was appropriate.

## E. Unanimity Instruction

Garcia claims the unanimity instruction the trial court gave conflicted with the age element of his convictions for sexual penetration and oral copulation with Doe 2 when she was 10 years old or younger (Pen. Code, § 288.7, subd. (b)). He is wrong.

As to these counts, the trial court instructed that Garcia was charged with violations "over broad periods of time, namely . . . 2011 to 2013," and to convict, the jurors must all agree the prosecution proved Garcia either (1) "committed at least one of these acts and you all agree on which act he committed for each offense," or (2) "committed all the acts alleged to have occurred during this time period" and "committed at least the number of offenses charged." (CALCRIM No. 3501.) Garcia claims this instruction allowed the jury to convict him for acts committed "anytime through the year 2013"—and because Doe 2 turned 11 in September of that year, this allowed the jury to convict him for acts committed when Doe 2 was 11.

But the unanimity instruction did not say the jury could convict for acts committed any time in 2013. The jury was also correctly instructed that the prosecution must prove that when Garcia engaged in a charged act of oral copulation or sexual penetration with Doe 2, she "was 10 years of age or younger." (CALCRIM No. 1128.) The unanimity instruction incorporated

38

this element by requiring that the prosecution prove Garcia committed acts constituting "each offense" or "at least the number of offenses charged." It was clear the jury needed to consider the elements of the offense in question, which were correctly stated in CALCRIM No. 1128.

" 'Jurors are presumed able to understand and correlate instructions.' " (*Thomas*, *supra*, 14 Cal.5th at p. 382.) In evaluating claims of instructional error, we consider the entire charge of the court, not just a part of a single instruction, to determine whether there is " ' "a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." ' " (*Ibid.*) There is no such likelihood here. The relevant instructions were adequate.

## F. Expert Testimony About Child Sexual Abuse

Garcia claims the trial court admitted expert testimony concerning child sexual abuse accommodation syndrome ("CSAAS") that went beyond the limits California courts have placed on such testimony, and the expert also impermissibly testified about a "profile" displayed by child abusers and about studies that were not in evidence. He also claims the jury instruction the court gave on CSAAS misstates the law and is argumentative. Each of these arguments is either forfeited or without merit.[6]

### 1. *Legal Background*

California courts deem CSAAS testimony admissible for the limited purpose of explaining how and why child victims may react in unexpected and perhaps counterintuitive ways to sexual abuse. Such testimony "is not admissible to prove that the complaining witness has in fact been sexually abused," but only to rehabilitate the "witness's credibility when the defendant

---

[6] Garcia's claims of constitutional error, which he fails to distinguish from these primary arguments, fail for the same reasons.

suggests [his or her] conduct after the incident . . . is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) The goal is to " 'disabuse jurors of commonly held misconceptions about child sexual abuse' " and " 'explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)

Appellate courts have held that a CSAAS expert may not " 'vouch[ ] for the veracity' " of the alleged victim by testifying that children rarely make false allegations of sexual abuse (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 179–180 (*Lapenias*)); opine on whether a particular victim is telling the truth (*People v. Munch* (2020) 52 Cal.App.5th 464, 468); or give " ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885–886). "Because the line between impermissible" and permissible use of CSAAS testimony "is by no means a bright one, the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383–1384 (*Gilbert*).)

We review the trial court's decision to admit CSAAS evidence for abuse of discretion. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 214–215 (*Ramirez*).)

2. *Expert Testimony at Trial*

Upon a motion in limine by the People, the trial court ruled that an expert could testify as to all five aspects of CSAAS: "[s]ecrecy, helplessness, entrapment[] and accommodation, delayed, conflicted and unconvincing

40

disclosure and possible retraction." The court directed Garcia to renew his objection that certain aspects of CSAAS were not relevant to the trial testimony "right before" the expert testified, if applicable. Garcia raised no such concern at trial and also raises no issue in this regard on appeal.

The People's expert was qualified to testify, not just about CSAAS, but about "child sexual abuse" more generally. During his testimony, the expert confirmed he had not been provided with any information about Garcia's case, explained the five aspects of CSAAS, and responded to several hypothetical questions by the prosecutor to which defense counsel did not object. He also responded to two questions after the trial court overruled objections by Garcia's counsel. First, the prosecutor asked whether the expert believed sexual abuse is more common than society recognizes and the expert said yes, because research shows "there still are misconceptions and myths that people hold about people who have been sexually abused, including children." The expert also responded to a question about the secondary trauma that may result when victims "have had to go to court and talk about their experience."

The court sustained defense counsel's objection to a question about whether it was inconsistent with child sexual abuse "for the perpetrator to be someone who's religious or well-respected within a church." The prosecutor than asked if it was inconsistent "for the perpetrator to be someone who's . . . perceived in the community as a doting father," and the expert responded, "[n]o," offered that this often "surprise[s]" people, and went on to opine that "it's also not necessarily related to . . . sexual gratification. . . . People who are not attracted to children sexually still do sexually abuse kids." The court overruled a defense objection to the prosecutor's follow-up question about sexual gratification, and the prosecutor asked a few more questions until the

41

expert clarified that it was not inconsistent with child sexual abuse for the abuser to obtain sexual gratification from the conduct.

The prosecutor then posed another series of hypothetical questions with no objection from the defense.  The court overruled an objection to a final hypothetical, whether it was inconsistent with child sexual abuse for a perpetrator to abuse both boys and girls, and the expert testified that while a pedophile might have a specific type, "the dominant thing" for most abusers "is identifying vulnerable children, gaining their trust, and then having the ability to maintain that secrecy, which is not gender or biological sex specific."

Outside the presence of the jury, the prosecutor requested permission to ask the expert whether a perpetrator's religiosity was inconsistent with child sexual abuse.  The trial court heard argument and ultimately agreed with Garcia's counsel that the testimony should focus on "the reaction of children" who have been abused, not "who may or may not commit sexual abuse."  The court found the religiosity issue was "outside the scope" of this principle, but acknowledged it had "already let [in]" some perpetrator-focused testimony "on other issues"—in particular, the questioning about whether an abuser "ha[d] to be a pedophile."  Garcia's counsel asked the court to admonish the jury to disregard the expert's testimony as to "his opinion of who . . . could be a child molester."  The court declined to do so, explaining that "a lot of it is inextricably intertwined" with understanding "the reactions of children."  Defense counsel moved for a mistrial, which the court denied.

On cross-examination, the expert clarified that CSAAS is not used to "decide . . . that [a child was] abused," but to "explain[]" the behavior of "a kid you know is abused."  Garcia's counsel asked about publications in the field that are critical of CSAAS or how attorneys have used it to argue abuse

42

happened.  He then asked about how the manner of conducting interviews of children who allege abuse can produce "false accusations," and the trial court sustained the prosecutor's objection to this question.  But the court overruled the prosecutor's objection to another question about how interview techniques can result in "false allegations," and the expert testified that "research shows that it's incredibly difficult to elicit that kind of response from a child, even with suggestive or leading questions.  Kids are pretty hearty against false or reporting of negative events and about people that they are close to."

3. *Analysis*

Garcia claims that portions of the expert's testimony exceeded the limits of permissible CSAAS testimony.  But he largely did not object on this ground at trial.  As our discussion above reflects, his counsel's objections focused on the expert's statements about "who . . . could be a child molester," a separate ground on which Garcia sought a mistrial and continues to press on appeal.  We address these two issues in turn before discussing Garcia's final point about publications concerning CSAAS.

First, Garcia claims the expert impermissibly recited case-specific facts. He points to testimony that victims can exaggerate details or "make stuff up" to justify why they did not fight back or disclose the abuse.  Garcia likewise challenges testimony that some children can act out in destructive ways, such as "cutting" or using drugs and alcohol, and that it is not inconsistent with abuse for a child to maintain a relationship with or be close or affectionate with the perpetrator.  But Garcia's counsel did not object that any of this testimony exceeded the limits of CSAAS testimony or mirrored facts related by the People's witnesses.  These objections are forfeited.  So are Garcia's objections to the expert's assertion that it is difficult to elicit false allegations from a child—which was a response to repeated questions by Garcia's own

43

counsel about false allegations, over objection by the prosecutor. (See *Gilbert*, *supra,* 5 Cal.App.4th at pp. 1384–1386 ["by inviting or reinforcing [an expert]'s answers by cross-examination and by failing to make pertinent objections or motions," appellant forfeited objections that testimony exceeded the limits of CSAAS testimony and improperly vouched for witnesses' credibility].)

Garcia did object to the expert's testimony that sexual abuse is more common than society recognizes, and that victims may experience secondary trauma from being required to talk about their experiences. But the first opinion does not relate to CSAAS or the credibility of children claiming abuse, and Garcia does not provide reasoned argument or authority to show it amounted to improper vouching or was otherwise objectionable. (See *Barone*, *supra*, 89 Cal.App.5th at p. 838, fn. 2.) Again, the expert was qualified to testify about child sexual abuse generally, not just CSAAS. Similarly, Garcia argues that the second opinion suggested "the jury should not be concerned that some of the witnesses' accounts contradicted their own stories, because that too was either the result of 'incomplete disclosure' or being subject to a secondary trauma in court." This mischaracterizes the expert's testimony. In his response to the question about secondary trauma, the expert merely stated that being in the perpetrator's presence or "anything that kind of calls [victims'] attention to [the abuse] again" will "trigger[] secondary trauma," which is "why treatment is in place, to help them deal with those reminders." This did not vouch for victims' credibility, and Garcia's contrary argument is unsupported.

Garcia also objected to some of the expert's testimony that various qualities of a perpetrator and surrounding circumstances were not inconsistent with child sexual abuse: for example, a perpetrator could be

"perceived in the community as a doting father" and could abuse both boys and girls. On appeal, Garcia claims this was impermissible profile evidence that exceeded the scope of appropriate CSAAS testimony. Again, this testimony about *perpetrators* does not relate to CSAAS or vouch for victims' credibility. As for the claim about profile evidence, our Supreme Court has explained that a "profile" refers to "a set of circumstances—some innocuous— characteristic of certain crimes or criminals." (*People v. Prince* (2007) 40 Cal.4th 1179, 1226.) "In profile testimony" (which is not categorically inadmissible), "the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*Ibid.*) That is not what happened here. The People's expert "did not offer an opinion that he believed defendant was the culprit" or "relate his findings to defendant at all." (*Ibid.*) Nor was his general testimony that certain characteristics of a perpetrator were not inconsistent with child sexual abuse the functional equivalent of a profile. Similar argument was deemed "utterly unconvincing" in *People v. Sedano* (2023) 88 Cal.App.5th 474, 483 (*Sedano*), where an expert "testified that 94 percent of abusers have some prior relationship with the victim." The Court of Appeal explained that this category is "so broad and nebulous that it cannot be construed as a 'profile' that would lead a jury to convict just because defendant falls within it." (*Ibid.*) As *Sedano* observed, *McAlpin* approved such testimony to counter the myth that abusers are deviant strangers and show that " 'there is no profile of a "typical" child molester.' " (*McAlpin, supra*, 53 Cal.3d at pp. 1302–1303.) Fairly interpreted, that was the aim of the testimony here.

The testimony in this case was wholly unlike the impermissible profile testimony addressed by *People v. Robbie* (2001) 92 Cal.App.4th 1075, which Garcia relies on. There, the expert testified to extremely specific conduct

matching the complaining witness's account: " 'engag[ing] in small talk,' " "acquiesc[ing] to the victim's request not to have sexual intercourse" and then "negotiat[ing]" other sex acts, "return[ing] the victim to her neighborhood, and ask[ing] questions about her life," even making a very specific comment to her (" 'nice pussy' "). (*Id.* at pp. 1078–1079, 1082–1083.) This case is more akin to *Sedano* and *McAlpin*.

Finally, Garcia claims it was error for the trial court to permit the expert to testify about publications that responded to the CSAAS concept, because the studies were inadmissible hearsay. This argument is doubly forfeited. Garcia did not object at trial to the expert's testimony about specific publications, which was largely elicited by his own counsel on cross-examination. On appeal, Garcia challenges the expert's "recitation" of "several studies" without providing foundation or connecting "names" to a "specific opinion." But he does not provide record citations to or otherwise identify the testimony in question, nor explain with reasoned argument his apparent claim that it crossed the line from permissible discussion of "sources" on which the expert based his opinion to impermissible assertions of hearsay "as independent proof of the [asserted] facts."

4. *CSAAS Instruction*

The trial court instructed the jury with CALCRIM No. 1193 that expert testimony about CSAAS "is not evidence that the defendant committed any of the crimes charged against him, or any other crimes with which he was not charged." The instruction clarified, "You may consider this evidence only in deciding whether the alleged victims' conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

46

Garcia claims the last part of the instruction contradicts the first part and incorrectly describes the law, because it is impossible "to use testimony to evaluate the believability of the witnesses whose accounts are the only evidence" of "the charged offenses, and simultaneously not use the testimony as evidence that [Garcia] committed those offenses." This argument "asserting the instruction[] w[as] incorrect" is reviewable despite Garcia's failure to object to the instruction below. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428 (*Buenrostro*).) But as Garcia acknowledges, several published opinions by other courts of appeal have rejected it, beginning with *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*).

In *Gonzales*, *supra*, 16 Cal. App.5th 494, as in this case, a CSAAS expert appropriately "testified that CSAAS is not a tool to help diagnose whether a child has actually been abused." (*Id.* at p. 503.) *Gonzales* held that in the context of this testimony, reasonable jurors would understand from CALCRIM No. 1193 that they could use CSAAS evidence to conclude relevant behavior "does not mean [a witness] lied when she said she was abused," and could not use it to conclude the witness "was, in fact, molested"; thus, "[t]he CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior" so that jurors who believed the evidence would find the "behavior does not affect her believability one way or the other." (*Id.* at p. 504.) Four subsequent published opinions are in accord with *Gonzales*. (*Munch*, *supra*, 52 Cal.App.5th at p. 474; *Lapenias*, *supra,* 67 Cal.App.5th at pp. 175–176; *Ortiz*, *supra,* 96 Cal.App.5th at p. 816; *Ramirez*, *supra,* 98 Cal.App.5th at pp. 219–220.) None are to the contrary, and we agree with our sister courts that CALCRIM No. 1193 accurately states the law in California.

Garcia next claims the instruction is argumentative because it "permits jurors to use CSAAS evidence to determine if the complainant's behavior is consistent with that of a sexual abuse victim, but ignores the defensive inference that the same behavior might suggest falsity." This claim is forfeited "because, at bottom, it is an argument that the instruction was incomplete" and Garcia failed to request a clarification below. (*Buenrostro, supra,* 6 Cal.5th at p. 428.) In any case, the jurors were instructed with CALCRIM No. 226 that they could consider witnesses' prior inconsistent statements and admissions to being untruthful in evaluating their credibility. This is the only behavior Garcia raises in his argument.

## G. Cumulative Error

Finally, Garcia claims the cumulative effect of errors committed requires reversal. We have found that several of Garcia's claims of error are forfeited. "To the extent his claims were either not forfeited or we have discussed their merits notwithstanding forfeiture, we have found either no error or no prejudice. Accordingly, we reject his claim of cumulative error." (*People v. Tully* (2012) 54 Cal.4th 952, 1061.)

## III. DISPOSITION

The judgment is affirmed.

48

_____

Clay, J.*


WE CONCUR:


_____

Brown, P. J.


_____

Streeter, J.


A165535/*People v. Garcia*

_____

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

49

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br>　　　　Plaintiff and Respondent,<br>v.<br>RAUL GARCIA,<br>　　　　Defendant and Appellant. | A165535<br>(Alameda County<br>Super. Ct. No. 18CR003071)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

　　It is ordered that the opinion filed on September 19, 2025, be modified as follows:

1. At the top of page 18, beginning on line 2 add as footnote 4 at the end of the parenthetical description enclosed by a parenthesis.  The addition of footnote 4 will require renumbering of all subsequent footnotes:

"for a Batson/Wheeler objection to a peremptory challenge forfeited the issue].)[4]

[4] Garcia filed a petition for rehearing, arguing that Government Code section 68081 required us to provide him with notice and opportunity to brief the issue of forfeiture.  But that section does not apply to issues like the standard of review that are " 'present in *every* case.' " (*People v. Alice* (2007) 41 Cal.4th 668, 678 (*Alice*), italics original.)  Forfeiture, "a rule

1

always implicated when an argument is raised for the first time on appeal," is such an issue. (*People v. Graham* (2024) 102 Cal.App.5th 787, 798, fn. 6 [forfeiture does not implicate Government Code section 68081]; *Tindall v. County of Nevada* (2025) 112 Cal.App.5th 78, 86, fn. 5 [same].) Still, in light of Garcia's concern, we exercise our discretion to consider the issue on its merits. (See *Estate of Herzog* (2019) 33 Cal.App.5th 894, 907.)"

2. On page 18, the first full paragraph will begin with the following addition:

"Garcia's argument that the prosecutor relied on presumptively invalid reasons also fails on the merits. It was Garcia's counsel, not the prosecutor, who raised D.M.'s employment history (§ 231.7, subd. (e)(11)) by arguing it could mitigate his youth and inexperience and faulting the prosecutor for failing to ask about it. Only then did the prosecutor explain that D.M.'s questionnaire "didn't indicate any lengthy employment history that would demonstrate contact with the community . . . in a great deal to indicate further life experience." This record does not support a finding that the prosecutor challenged D.M. based on his employment history: to hold otherwise would allow defense counsel to put words in the prosecutor's mouth. Garcia's argument that the prosecutor's concern about D.M.'s skepticism towards individuals who alleged sexual assault was really about his distrust of "law enforcement or the criminal legal system" (§ 231.7, subd. (e)(1)) is even more of a stretch. There may be cases where prosecutors give "shifting explanations" to hide their true motives. (*Foster v. Chatman* (2016) 578 U.S. 488, 501–512 [discussing long, shifting lists of reasons that were unsupported or contradicted by the record].) Here, the prosecutor was succinct, consistent, and persuasive in her explanation. There is no suggestion that she failed to disclose her true reasons for exercising a peremptory challenge against D.M."

3. On page 18, the first sentence of the paragraph beginning with "Garcia similarly forfeited" should be changed to "Finally, Garcia forfeited any claim of prejudice from the trial court's statement that he bore the burden to prove the challenge was improper where subdivision (e) did not apply."

4. On page 18, at the end of the last sentence of the paragraph beginning with, "Garcia similarly forfeited," insert as footnote 5 after the parenthetical description beginning with "[claims unsupported by "reasoned argument," "citation to relevant authorities," or discussion of prejudice were forfeited].)[5]" the following footnote:

2

"[5] Garcia's forfeiture of any such argument by failing to develop it in his appellate briefing does not implicate Government Code section 68081."

The addition of footnote 5 will require renumbering of all subsequent footnotes.

5. On page 31, add as footnote 7 to the subheading: "6. Specific Objections to Particular Witnesses[7]" the following:

"[7] We have addressed these objections on their merits and not solely "on th[e] basis" of forfeiture in the trial court. (*Alice*, *supra*, 41 Cal.4th at p. 679.) Garcia's claim that we must grant rehearing so he may address the forfeiture is without merit."

The addition of footnote 7 will require renumbering of all subsequent footnotes.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

The opinion in the above-entitled matter filed on September 19, 2025, was not certified for publication in the Official Reports. For good cause it now appears that parts I and IIA, and the paragraph above section I of the opinion, should be published in the Official Reports and it is so ordered.


Date: _____10/9/2025_____       _____Brown_____, P. J.

3

*People v. Garcia (A165535)*

Trial Court:          Alameda County Superior Court


Trial Judge:          Hon. Thomas E. Stevens



Attorneys:


        Janet Jo Gray for Defendant and Appellant.


        Rob Bonta, Attorney General of California, Lance Eric Winters, Chief Assistant Attorney General, Jeffrey Michael Kanter Laurence, Senior Assistant Attorney General, Donna Marie Provenzano, Supervising Deputy Attorney General, Amit Arun Kurlekar, Deputy Attorney General for Plaintiff and Respondent.